Filed 5/22/13  Scott v. Lennar CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MARSAE SCOTT et al.,<br><br>　　　　Plaintiffs and Appellants,<br><br>v.<br><br>LENNAR CORPORATION et al.,<br><br>　　　　Defendants and Respondents. | A133890<br><br>(City & County San Francisco<br>Super. Ct. No. CGC-08-274702) |

Plaintiffs[1] appeal after the trial court granted separate motions for summary judgment filed by each of the three defendants—(1) Lennar Corporation; Lennar-BVHP, LLC; Lennar Homes of California, Inc.; Lennar Associates Management, LLC; and Lennar Communities, Inc. ("Lennar"); (2) Gordon N. Ball, Inc. ("Ball");[2] and (3) CH2M Hill (collectively "defendants")—in plaintiffs' tort action arising from their alleged exposure to hazardous substances in dust displaced by defendants during the grading

---

[1] The fifteen plaintiffs (collectively "plaintiffs") who are parties to this appeal are Marsae Scott (a minor) through his guardian ad litem Sonja Sawyer; Lavisa Bonner; Octavio Solozano; Adela Flores Balanos; Arshad Muhammad (a minor) and Azraa Muhammad (a minor) through their guardian ad litem Catherine Muhammad; Pettrenelia Thomas; Madinah Muhammad (a minor) through her guardian ad litem Tonja Muhammad; Brooke Washington (a minor), Sahkari Washington (a minor), Amir Washington (a minor), and Anisa Washington (a minor) through their guardian ad litem Kim Washington; Samantha Simon; Tariqu Muhammad (a minor) and Toniesha Byrd (a minor) through their guardian ad litem Anastasia Muhammad.

[2] The complaint erroneously referred to defendant Ball as "Gordon N. Ball, Inc.—Yerba Buena Engineering & Construction, Inc."

1

phase of a redevelopment project. On appeal, plaintiffs challenge the trial court's grant of summary judgment, arguing that triable issues of material fact exist regarding causation as to all claims. We shall affirm the judgments.

## *PROCEDURAL BACKGROUND*

On June 19, 2008, eighteen plaintiffs filed a complaint for damages against Lennar, Ball, and CH2M Hill.[3] The complaint included causes of action for public nuisance, negligence (environmental racism), intentional and negligent infliction of emotional distress, and battery. The plaintiffs alleged that they were injured by dust containing naturally occurring asbestos, which became airborne as a result of defendants' grading-related activities on a parcel of land in San Francisco. They further alleged that they had suffered various physical symptoms from the asbestos, including headaches, red eyes, bronchitis and other respiratory problems, sinus infections, nosebleeds, cardiac pain, and skin rashes.

In May 2011, each of the three defendants filed separate motions for summary judgment. On August 30, 2011, the trial court granted Ball's summary judgment motion and, on September 8, 2011, the court granted Lennar's and CH2M Hill's summary judgment motions.

On November 4, 2011, plaintiffs filed a notice of appeal.

## *FACTUAL BACKGROUND*

Defendant Lennar was the master developer for a redevelopment project at the Hunters Point Naval Shipyard in San Francisco. The land at the shipyard is divided into six parcels, including "Parcel A," the northernmost parcel. Parcel A, which was the location of the redevelopment project, is on a hilltop comprised of soil and rock, including serpentine. Serpentine contains naturally occurring asbestos, as well as arsenic, iron, manganese, and nickel. In 1992, the Navy began environmental testing and cleanup

---

[3] Fifteen of those eighteen plaintiffs are parties to this appeal.

at the site, which continued for more than 10 years under the oversight of the United States Environmental Protection Agency ("EPA") and other regulators.  In 2004, the regulators agreed with the Navy's conclusion that all necessary remedial actions had been taken "to protect human health and the environment prior to property transfer."  Parcel A was therefore deemed suitable for unrestricted residential use.

Nevertheless, because of the presence of naturally occurring asbestos in the serpentine rock beneath Parcel A, the San Francisco Department of Public Health (DPH) required Lennar to prepare an asbestos dust mitigation plan, which included daily monitoring of asbestos levels.  This plan was approved by the Bay Area Air Quality Management District.  Lennar also prepared a dust control plan, which was designed to ensure that dust emitted into the air from soil grading activities would not exceed certain levels.  This plan was approved by the DPH.

Lennar contracted with defendant Ball to provide soil-grading services and with defendant CH2M Hill to provide air monitoring during the grading phase of the project. Significant earth-moving activities began on Parcel A on approximately April 25, 2006 and grading began on approximately May 23, 2006.  In August 2006, CH2M Hill reported to Lennar that it had discovered problems with its air monitoring data.  Lennar then hired another company to monitor for airborne asbestos, from August 2006 until the grading ended in October 2007.  However, as a result of CH2M Hill's monitoring problems, no measurement of asbestos in the air was available from April 2006 through July 2006.

Numerous independent studies and reports were prepared regarding public health risks resulting from possible exposure to naturally occurring asbestos during the grading of Parcel A.  All of these reports concluded that the public was not at risk of harm due to the release of asbestos dust from Parcel A.[4]

---

[4] We will discuss these reports in more depth in part II of the Discussion, *post*.

3

## DISCUSSION

### I. *Summary Judgment Rules and Standard of Review*

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code of Civ. Proc. § 437c, subd. (c).)[5] A defendant moving for summary judgment has the initial burden of showing either that one or more elements of the cause of action cannot be established or that there is a complete defense. (§ 437c, subd. (p)(2).) If that initial burden is met, the burden shifts to the plaintiff to show the existence of a triable issue of fact with respect to that cause of action or defense. (*Ibid*; see *Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 850–853 (*Aguilar*).)

" ' "[W]e take the facts from the record that was before the trial court when it ruled on that motion," ' and ' " ' "review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' " ' [Citations.]" (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1039.) We view the evidence in the light most favorable to the plaintiffs and we " 'liberally construe' " plaintiffs' evidence and " 'strictly scrutinize' that of defendants 'in order to resolve any evidentiary doubts or ambiguities in [plaintiffs'] favor. [Citation.]' [Citation.]" (*Miranda v. Bomel Construction Co., Inc*. (2010) 187 Cal.App.4th 1326, 1335 (*Miranda*).)

### II. *Trial Court Background*

Plaintiffs in this case are adults who either lived or worked near Parcel A and minors who either lived or attended school near Parcel A.

---

[5] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

4

In support of their motions for summary judgment, defendants submitted declarations from two physicians, Dr. Michael Fischman and Dr. Thomas Allems, both of whom are experts in occupational and environmental medicine and toxicology. They each performed "Independent Medical Examinations" on and reviewed the medical records of all plaintiffs who made themselves or their records available.[6] They also reviewed relevant environmental and environmental health reports related to the grading of Parcel A. Both doctors concluded: (1) the plaintiffs' various ailments were neither caused nor exacerbated by exposure to asbestos, and (2) none of the plaintiffs suffer from asbestosis, asbestos-related lung disease, mesothelioma, or any other illness related to asbestos exposure.

In support of its summary judgment motion, CH2M Hill also submitted the declaration of Dr. David Weill, an associate professor in pulmonary and critical care medicine at Stanford University Hospital, who had reviewed the plaintiffs' medical records. Dr. Weill concluded that none of the plaintiffs suffered from any asbestos-related disease, process, or condition.

In addition, defendants submitted various independent studies and reports that addressed the possible health risks from the release of airborne asbestos from Parcel A. For example, in February 2007, Arc Ecology, a nonprofit public interest organization that provides environmental technical advice and support to environmental justice communities and local governments on the cleanup and reuse of closed military facilities, issued a report following an investigation of allegations regarding possible health threats from asbestos dust at the Parcel A site. The report concluded that, while Lennar had experienced ongoing difficulties complying with the asbestos and dust control plan, *"there is currently no evidence that Asbestos from the grading operation on Parcel A*

---

[6] Plaintiff Dom'Monique Green refused to appear for an examination and plaintiffs Amir Washington and Toneisha Byrd did not provide any medical records to defendants.

*poses an endangerment to human health and the environment*" and expressed skepticism "about claims that asbestos pollution from these operations is harming nearby residents and students at the Muslim University Institute (MUI)."[7]  (Bold omitted.)

Also in February 2007, the DPH hired private contractors, including Treadwell & Rollo, Inc., an environmental consulting firm, which issued a report evaluating the potential for community exposure to airborne asbestos near the Parcel A grading operation.  Based on an analysis of the asbestos air sampling data, the predicted "worst case average exposure levels" during the entire period of grading was a total of 5,403 asbestos structures per cubic meter.  Treadwell & Rollo noted that the Bay Area Air Quality Management District requires work suspension when asbestos levels reach 16,000 structures per cubic meter, based on the increased likelihood (an increased risk of 1 in 10,000) of an individual getting asbestos-related cancers if exposed to this level continuously for a 70-year period.

In June 2007, the DPH issued a report discussing the dust control issues and reviewing data on the possible health effects of dust from Parcel A.  The report concluded:  "All of the analysis concludes that given the limited exposure periods and levels that have occurred at the Shipyard, there is no medical or scientific evidence that dust from naturally occurring asbestos generated from the grading operations on Parcel A poses an endangerment to human health.  Even if 'worst case' assumptions are made about the period when Lennar's asbestos air monitors were not functioning during the summer of 2006, . . . there was no significant risk to human health."  The report also discussed misstatements made about dust control issues, and described the claim that the "community is being blasted by poisonous dust" as "probably the most egregious misstatement.  [L]eading scientists from various areas of expertise have all concluded

---

[7] The report did contain a recommendation to temporarily move students from MUI to another location due to "the potential impact of *dust* on the short term well being of students . . . ."  (Bold omitted.)

that it is highly unlikely that construction dust from Lennar's construction activities poses any long-term or serious health risks, given the levels, types and duration of exposure to naturally occurring asbestos."

In September 2007, Dr. John Balmes, a professor of medicine at the University of California, San Francisco, and chief of the Division of Occupational and Environmental Medicine at San Francisco General Hospital, reported the results of his evaluation, undertaken at the request of leaders of the Bayview-Hunters Point community, regarding possible health risks from asbestos dust from Parcel A. Dr. Balmes agreed with DPH "that it is highly unlikely that exposure to naturally occurring asbestos from grading operations at Parcel A will create a significant risk to human health in the community." He further stated: "While it is important that we remain mindful of and responsive to community health concerns, and their possible link to the neighborhood environment, it is also important that we not improperly attribute the cause of these health concerns to the recent grading activities at the Shipyard. I believe that the health problems that the community is experiencing are likely caused by events and circumstances that are unrelated to Lennar's construction activities at Hunter's Point Shipyard. Many of the health concerns predate construction and involve symptoms that are not associated with exposure to naturally occurring asbestos."

In June 2010, after evaluating the project's dust control measures and people's possible exposure to dust containing naturally occurring asbestos in the area near Parcel A, the EPA issued a report in which it concluded that the potential risks "were within EPA's defined acceptable risk range" and stated that its "results confirm previous conclusions by the Air District, the San Francisco Department of Public Health, and the California State Department of Public Health that the daily monitoring results are within acceptable risk levels."

In their opposition to the motions for summary judgment, plaintiffs for the first time alleged that their injuries were caused by "exposure to toxic dust," stating in a

footnote that the complaint had referred "to the toxic dust generally as asbestos dust. Prior to discovery, it was the only known toxic substance in the dust."

In support of their opposition to the motions for summary judgment, plaintiffs submitted a portion of the "Hunters Point Shipyard Parcel A Environmental Issues And Hazardous Materials Report" to show that toxic "components were found in the soil and air at Parcel A." The trial court sustained defendants' objections to this evidence on the grounds of lack of foundation, lack of personal knowledge, and hearsay. In addition, plaintiffs submitted printouts of fact sheets from the website of the Centers for Disease Control and Prevention (CDC), which described possible health effects associated with exposure to components found in the soil of Parcel A. The trial court also sustained defendants' objections to this evidence on the grounds of lack of foundation, lack of personal knowledge, and hearsay. In addition, plaintiffs referred to excerpts from the deposition testimony and reports of defendants' two experts, in which they spoke about the possible health effects of dust and certain other substances.

Plaintiffs also submitted portions of the deposition testimony of Jeffrey Austin, former division environmental manager for Lennar, who testified that Lennar received a number of notices of violation of the dust control plan during the grading process for, inter alia, inadequate dust control and for dust crossing property lines. Lennar also received a notice of violation for CH2M Hill's failures to monitor, for which Lennar paid a $587,000 fine.[8]

In supplemental declarations in support of defendants' motions for summary judgment, filed after plaintiffs raised "toxins" as a cause of their symptoms in their

---

[8] Lennar filed an unrelated lawsuit against CH2M Hill regarding the lapse in data collection. Plaintiffs and CH2M Hill argue about the admissibility of evidence of that lawsuit in this case. We need not resolve this question of admissibility because the evidence is not relevant to resolution of the issues before us.

We also observe that the failure to monitor related only to *asbestos*. No monitoring for other toxins was required or performed.

opposition to summary judgment, Dr. Fischman and Dr. Allems each concluded: (1) there was no reasonable medical probability that any of the plaintiffs were exposed to toxins—including pesticides, abrasive blast materials, beryllium, arsenic, iron, chromium, manganese, nickel, total petroleum hydrocarbons, benzo (a) pyrene, semi-volatile organic compounds, polynuclear aromatic hydrocarbons, lead based paint, polychlorinated biphenyls, formaldehyde, asbestos containing material—from Parcel A's soil in an amount sufficient to cause a toxic injury; (2) there was no reasonable medical probability that the plaintiffs had suffered a toxic injury from any of these materials; (3) there was no reasonable medical probability that the symptoms described by the plaintiffs were caused by toxins from Parcel A's soil or its contents; and (4) there was no reasonable medical probability that the plaintiffs would suffer from a toxic injury in the future due to exposure to Parcel A's soil or its contents during the grading activities.

In granting summary judgment, the court found, as to the causes of action for negligence, battery, and negligent and intentional infliction of emotional distress, that plaintiffs had "failed to create triable issues of fact as to exposure to asbestos, exposure to other toxins, and a causation of injuries resulting from any such exposure." The court further found, as to the negligent and intentional infliction of emotional distress causes of action, that an "unfounded fear does not create a triable issue of fact." In addition, as to the public nuisance cause of action, the court found that plaintiffs had "failed to present any evidence of the presence of asbestos laden dust and that the levels, if any, were injurious to their health. There is, therefore, no triable issue of fact as to causation." The court also denied plaintiffs' oral motion, made at the summary judgment hearing to amend their complaint to allege injury from other "toxic dust" in addition to asbestos.

### III. *Sufficiency of the Complaint and Timeliness*
### *of the Motion to Amend the Complaint*

Plaintiffs contend the trial court improperly denied their motion to amend the complaint, made orally at the hearing on defendants' summary judgment motions. (But

9

see, e.g., *Melican v. Regents of University of California* (2007) 151 Cal.App.4th 168, 175–176 [affirming denial of plaintiffs' untimely oral motion to amend the complaint made at hearing on defendant's summary judgment motion].) Plaintiffs further contend the court erred when it found the allegations of the complaint insufficient due to failure to specify the toxins alleged to have caused their injuries. (But see *Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 80 (*Bockrath*) [plaintiff must allege in complaint "that he was exposed to each of the toxic materials claimed to have caused a specific illness"].) We need not definitively decide whether the court's findings on these two issues were correct because we conclude, as discussed in part IV, *post*, that summary judgment was properly granted in favor of all defendants on the ground that plaintiffs failed to show the existence of a triable issue of material fact as to causation for any of their causes of action, whether we consider the alleged exposure to be to asbestos, to other toxins, or to both. (See *Aguilar*, *supra*, 25 Cal.4th at pp. 850–853.)

## IV. *Causation*

Plaintiffs contend the trial court erred when it granted summary adjudication as to each cause of action on the ground that they had not raised a triable issue of material fact regarding causation.

" ' "Causation" is an essential element of a tort action. Defendants are not liable unless their conduct . . . was a "legal cause" of plaintiff's injury. [Citations.]' [Citation.]" (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 696 (*Whiteley*).) In *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 982–983, fn. omitted (*Rutherford*), our Supreme Court explained, in the context of asbestos-related latent injuries, the plaintiff's burden of proving causation: "[T]he plaintiff must first establish some threshold *exposure* to the defendant's defective asbestos-containing products, *and* must further establish a reasonable medical probability that a particular exposure or series of exposures was a 'legal cause' of his injury, i.e., a *substantial factor* in bringing about the injury." (Accord *Whiteley*, *supra*, 117 Cal.App.4th at p. 698

10

[applying *Rutherford's* burden of proof to causation in a toxic tort context].) "The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony." (*Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402–403 (*Jones*); accord, *Bockrath*, *supra*, 21 Cal.4th at p. 79.)

In the present case, all of plaintiffs' causes of action require proof of causation.[9] One of the elements of a cause of action for negligence is causation. (*Miranda*, *supra*, 187 Cal.App.4th at p. 1335.) To avoid summary adjudication on their negligence claim, plaintiffs had to raise a triable issue of fact as to, inter alia, whether defendants' actions were " ' " 'the proximate or legal cause of the resulting injur[ies].' " ' " (*Ibid*.) Causation is also one of the elements of civil battery. (*Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 526–527.) Therefore, to avoid summary adjudication on their battery claim, plaintiffs were required to raise a triable issue of fact as to, inter alia, whether defendants "intentionally performed an act that resulted in a harmful or offensive contact with [each] plaintiff's person" and that "the harmful or offensive contact caused injury, damage, loss, or harm to [each] plaintiff." (*Ibid*.) To succeed on a public nuisance cause of action, a plaintiff must also prove causation. (*Birke v. Oakwood Worldwide* (2009) 169 Cal.App.4th 1540, 1548.) Thus, to avoid summary adjudication on their public nuisance claim, plaintiffs had to raise a triable issue of fact as to, inter alia, whether they "suffered harm that was different from the type of harm suffered by the general public" and whether defendants' "conduct was a substantial factor in causing [each plaintiff's] harm." (*Ibid*.)[10]

---

[9] We will assume, solely for purposes of deciding whether plaintiffs have raised a triable issue of fact regarding causation, that all defendants are similarly situated and would be similarly liable for damages, despite the fact that their roles in the grading of Parcel A were distinct.

[10] Plaintiffs assert, for the first time on appeal, that evidence of physical injury is not required for them to succeed on their public nuisance and battery claims. Given that

To succeed on a claim of negligent infliction of emotional distress, a plaintiff who alleges that he or she suffered a personal injury can only recover "for emotional distress resulting from a personal injury directly caused by the defendant's tortious conduct." (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 555, discussing *Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965 (*Potter*).)  Hence, to avoid summary adjudication on their negligent infliction of emotional distress claim, plaintiffs had to raise a triable issue of fact as to, inter alia, whether their injuries were caused by defendants' allegedly negligent activities related to the grading of Parcel A.  Finally, to succeed on an intentional infliction of emotional distress claim, a plaintiff must prove that his or her "fear of cancer is reasonable, that is, that the fear is based upon medically or scientifically corroborated knowledge that the defendant's conduct has significantly increased the plaintiff's risk of cancer and that the plaintiff's actual risk of the threatened cancer is significant." (*Potter*, *supra*, 6 Cal.4th at p. 1004.)  To avoid summary adjudication on their intentional infliction of emotional distress claim, plaintiffs therefore had to raise a triable issue of fact as to, inter alia, whether they were in fact exposed to toxins that have "significantly increased" their risk of future cancer or similar illness.  (*Ibid*.)[11]

---

the allegations in the complaint and the arguments in opposition to defendants' summary judgment motions regarding these two causes of action all involved claims that they had suffered physical harm, we will not address this new assertion.  (See *People v. Saunders* (1993) 5 Cal.4th 580, 589–590.)  We also note that, regardless of the type of injury alleged, causation must still be proven as to all causes of action alleged, including the public nuisance and battery claims.

[11] Plaintiffs observe that there is an exception to the requirement that a plaintiff in a toxic exposure case satisfy the "more likely than not" threshold for fear of cancer recovery to prove emotional distress where "the plaintiff pleads and proves that the defendant's conduct in causing the exposure amounts to 'oppression, fraud, or malice' as defined in Civil Code section 3294, which authorizes the imposition of punitive damages." (*Potter*, *supra*, 6 Cal.4th at p. 998.)  That exception is of course not relevant here unless plaintiffs can raise a triable issue of fact regarding the exposure element of causation.

12

In support of their summary judgment motions, defendants submitted the declarations of their two experts, Dr. Fischman and Dr. Allems, each of whom had examined and reviewed the medical records of all plaintiffs who had made themselves or their records available, and had also reviewed environmental and environmental health reports related to the grading of Parcel A. Both doctors concluded that plaintiffs' various ailments were neither caused nor exacerbated by exposure to asbestos,[12] and that none of the plaintiffs suffer from asbestosis, asbestos-related lung disease, mesothelioma, or any other illness related to asbestos exposure. CH2M Hill's expert, Dr. Weill, also concluded that plaintiffs did not suffer from any asbestos-related diseases or conditions. In addition, numerous reports issued by various governmental agencies and others concluded that the grading of Parcel A had not caused the release of harmful amounts of asbestos into the air.

As to the later-alleged toxic dust claims, both Dr. Fischman and Dr. Allems concluded there was no reasonable medical probability that any of the plaintiffs were exposed to any toxins from Parcel A's soil in an amount sufficient to cause a toxic injury, that the plaintiffs had suffered a toxic injury from any of these materials, that the symptoms described by the plaintiffs were caused by toxins from Parcel A's soil or its contents, or that the plaintiffs would suffer from a future toxic injury due to exposure to Parcel A's soil or its contents during the grading activities.

All of this evidence negating causation plainly satisfied defendants' initial burden of showing that one or more elements of plaintiffs' claims could not be established. The burden therefore shifted to plaintiffs to raise a triable issue of material fact as to whether

---

[12] Plaintiffs are thus incorrect when they assert that the medical examinations focused only on "seeking out signs of cancer or lung related disease." Dr. Fischman and Dr. Allems explicitly addressed whether exposure to asbestos had caused or exacerbated plaintiffs illnesses.

13

they were exposed to toxic dust from Parcel A[13] and whether that dust caused their illnesses.  (See § 437c, subd. (p)(2).)

"When the moving party produces a competent expert declaration showing there is no triable issue of fact on an essential element of the opposing party's claims, the opposing party's burden is to produce a competent expert declaration to the contrary. [Citations.]"  (*Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 761–762; see also *Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367, 1385 ["In California, causation must be founded upon expert testimony and cannot be inferred from the jury's consideration of the totality of the circumstances unless those circumstances include the requisite expert testimony on causation"]; *Jones*, *supra*, 163 Cal.App.3d at pp. 402–403 [causation must be proven within a reasonable medical probability *based upon competent expert testimony*].)  Expert testimony is particularly important in toxic tort cases such as this one, which presents " 'complicated and possibly esoteric medial causation issues . . . .' " (*Whiteley*, *supra*, 11  Cal.App.4th at p. 699.)

Here, plaintiffs did not submit any expert declarations in opposition to defendants' experts' declarations and other evidence that showed no risk of toxic exposure or illness due to the grading activities at Parcel A.  Instead, to demonstrate exposure to the various toxins, plaintiffs relied on the "Hunters Point Shipyard Parcel A Environmental Issues And Hazardous Materials Report."  That report, however, explains that the Navy had performed remedial activities at Parcel A, including excavation to a depth of two feet below ground surface, with the excavation backfilled with clean soil.  While the non-

---

[13] Plaintiffs assert that defendants did not challenge their claim that they were exposed to asbestos and other toxic dust.  To the extent that Lennar did not challenge exposure in its initial motion, that concession related only to asbestos, not to the toxic dust plaintiffs subsequently claimed caused their injuries.  Moreover, no other defendant conceded the exposure element.  Plaintiffs must raise a triable issue of fact as to the exposure element of causation to survive summary judgment.  (See *Rutherford*, *supra*, 16 Cal.4th at pp. 982–983.)

14

excavated soil still contained low levels of pesticides, motor oil, beryllium chromium, manganese, and nickel, the report found that "the potential for migration of these chemicals to air and surface water was considered insignificant because of the clean backfill placed in the excavation. [¶] All appropriate regulatory agencies determined that no further action was necessary at this site" and the land was approved for unrestricted residential use. Thus, even assuming the report was admissible, it actually undermines plaintiffs' contention that they were exposed to a dangerous level of those toxins in the form of dust from Parcel A. (See *Rutherford*, *supra*, 16 Cal.4th at pp. 982–983.)

In addition, plaintiffs' reliance on the deposition testimony of Lennar employee Jeffrey Austin, who testified about notices of violation of the dust control plan Lennar received during the grading process, does not demonstrate that *these plaintiffs* were exposed to a dangerous level of toxic dust. (See *Rutherford*, *supra*, 16 Cal.4th at pp. 982–983.) Indeed, plaintiffs did not submit any admissible evidence regarding *their* exposure to toxic dust. Rather, plaintiffs' counsel merely states in his opening brief that "toxic dust consistently blanketed Plaintiffs' persons and property during the grading work at Parcel A, entering Plaintiffs' eyes, mouths, noses, and covering their skin." Counsel's statement plainly is not sufficient to raise a triable issue of fact as to exposure.[14]

To show that exposure to the various toxins caused their illnesses, plaintiffs submitted the CDC fact sheet printouts regarding possible health effects associated with exposure to the toxins allegedly found in the soil at Parcel A. Once again, even assuming

---

[14] At oral argument plaintiffs' counsel stated that certain pages in Appellants' Appendix contained evidence of plaintiffs' exposure to toxic dust. In the cited pages, which are part of plaintiffs' opposition to CH2M Hill's summary judgment motion, plaintiffs merely restate their assertions related to CH2M Hill's failure to properly monitor for dust and their claim that dispersion of dust into the atmosphere affected the surrounding community. Such general allegations do not satisfy plaintiffs' burden of raising a triable issue of fact as to each plaintiffs' exposure to dangerous levels of toxic dust.

that the printouts were admissible evidence, they are not helpful to plaintiffs' case because they merely show that exposure to these substances at a sufficient level could cause illness in the general population. This evidence is wholly speculative in that it does nothing to show that these particular plaintiffs were exposed to these particular toxins in an amount sufficient to cause illness or that the toxins were a substantial factor in causing *their* illnesses. (See *Rutherford*, *supra*, 16 Cal.4th at pp. 982–983; see also *Jones*, *supra*, 163 Cal.App.3d at p. 403 ["There can be many possible 'causes,' " of an injury, but a "possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of [the defendant's] action"].)

Finally, plaintiffs attempt to use isolated language from defendants' experts' deposition testimony to raise a triable issue of fact as to causation does not succeed in doing so. For example, in his deposition, Dr. Fischman testified that soil containing a high concentration of arsenic in industrial settings "may be a problem," that nickel can uncommonly cause asthma "with high-dose exposure in industrial settings," and that dust, "at sufficient dose," could exacerbate certain conditions. Plaintiffs also cited Dr. Allems's deposition testimony, in which he stated that, potentially, "under certain conditions," soil dust could dry someone's nose enough to cause bleeding or exacerbate asthma. He further testified that the primary health effects of exposure to dust "when dust levels were high and somebody had low tolerance for it," were "really limited to mucus membrane . . . irritant symptoms." Plaintiffs' selective use of defendants' experts' testimony suggests, at best, the possibility that exposure to dust can cause minor, transient symptoms and that exposure to high levels of certain compounds can cause or exacerbate certain conditions. To extrapolate from that evidence that the allegedly toxic

dust in this case caused plaintiffs' illnesses is pure speculation. (See *Jones*, *supra*, 163 Cal.App.3d at p. 403.)[15]

In sum, plaintiffs' evidence, which lacks competent expert testimony or any other evidence showing causation, failed to raise a triable issue of fact as to whether (1) any of these plaintiffs were exposed to particular toxins in the dust from Parcel A at sufficient levels to cause harm, and (2) that toxic dust was a substantial factor in any of plaintiffs' illnesses. (See *Rutherford*, *supra*, 16 Cal.4th at pp. 982–983; see also *Jones*, *supra*, 163 Cal.App.3d at pp. 402–403.)[16]

Because plaintiffs did not satisfy their burden of raising a triable issue of material fact as to causation on any of their causes of action, the trial court properly granted

---

[15] Plaintiffs, for example, point to passages in Dr. Allems's report regarding plaintiff Adela Flores Balanos, in which he stated that airborne dust from the grading "may have played a role in some of her asthma symptoms during that time (although her baseline asthma activity is not documented due to the paucity of medical records)." Dr. Allems concluded that the "extent of the potential health effects from airborne soil dusts in these circumstances is essentially limited to transient mucous membrane irritant symptoms during the period of suspect exposure. She has not sustained a toxic injury. There are no asbestos issues of concern." The statement that dust alone "may have" temporarily aggravated this plaintiff's asthma symptoms does not raise a triable issue of fact in this toxic tort action as to causation, which must be proved "within a reasonable medical probability based upon competent expert testimony." (*Jones*, *supra*, 163 Cal.App.3d at pp. 402–403.)

[16] In their reply brief, plaintiffs assert in a conclusory manner that the trial court "completely disposed of both the Negligence and [intentional infliction of emotional distress] claims without mention of the environmental racism allegation [alleged in the complaint] or a challenge thereto. [Plaintiffs] need not prove that they were harmed by 'dust,' [']asbestos dust,' or, arguendo, asbestosis, to present a claim of Negligence or [intentional infliction of emotional distress claims] resulting from environmental racism." In addition to having failed to raise this point in their opening brief [see *Crowley Maritime Corp. v. Boston Old Colony Ins. Co.* (2008) 158 Cal.App.4th 1061, 1072 [points raised for the first time in reply brief will generally not be considered]), plaintiffs cite no authority in support of this assertion, and we will not consider it. (See *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 [treating contentions not supported by "cogent legal argument or citation of authority" as waived].)

17

summary judgment in favor of all defendants.  (See § 437c, subd. (p)(2); *Aguilar*, *supra*, 25 Cal.4th at pp. 850–853.)

## *DISPOSITION*

The judgments are affirmed.  Costs on appeal are awarded to defendants Lennar, Ball, and CH2M Hill.


_____
Kline, P.J.


We concur:


_____
Haerle, J.


_____
Lambden, J.